ORIGINAL

FILED IN CLERK'S OFFICE
᠁ᡰᡅᠣta

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

AUG 0 1 2005

LUTHER ᠁ ᠁, Clerk

By: ᠁ Deputy Clerk

| | | |
|---|---|---|
| MICHAEL PUTNAM and | ) | |
| WEP ENTERPRISES, INC., | ) | |
| a Georgia corporation, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v | ) | CIVIL ACTION FILE |
| | ) | NO. _____ |
| HENKEL CONSUMER ADHESIVES, | ) | 1 05-CV 2011 |
| INC , a/k/a HENKEL CA, INC , | ) | |
| f/k/a MANCO, INC , | ) | |
| a foreign corporation, | ) | BBM |
| | ) | |
| Defendants | ) | |

## COMPLAINT

COME NOW, Plaintiffs, Michael Putnam and WEP Enterprises, Inc., by and

through their undersigned counsel and files their Complaint against the above-

named Defendant, and for its cause of action states.

## PARTIES

1    Michael Putnam is a resident and citizen of Georgia

2.   WEP Enterprises, Inc., is a corporation organized under the laws of the State

of Georgia, and having its principal place of business at 4645 Clary Lakes

Drive, Roswell, Georgia 30075   WEP is owned by Putnam, who also acts as



its president and chief executive officer   WEP and Putnam will hereinafter be referred to collectively as "WEP".

3   Henkel Consumer Adhesives, Inc., also known as Henkel CA, Inc (collectively "Henkel CA"), is an Ohio corporation with its principal place of business located in Avon, Ohio.  Henkel CA may be served by service upon its registered agent CT Corporation System, 1300 East Ninth Street, Cleveland, Ohio 44114.  Upon information and belief, Henkel CA advertises, promotes, markets, sells and offers for sale shelf lining materials to retailers in the State of Georgia, including the products that Henkel CA uses to induce infringement of the patent-in-suit as described more particularly herein

## JURISDICTION AND VENUE

4   This is an action for patent infringement arising under the provisions of the Patent Laws of the United States of America, Title 35, United States Code. This court has subject matter jurisdiction over Plaintiffs' claims of patent infringement pursuant to 28 U S.C § 1331 and 28 U.S.C. § 1338 (a)

5   WEP also asserts a claim for Breach of Contract arising under laws of the State of Georgia.  This court has jurisdiction over WEP's Breach of Contract claim pursuant to 28 U.S C. § 1367(a)

6    Diversity jurisdiction exists pursuant to 28 U S.C. § 1332, as this is an action

between citizens of different states, and as the amount in controversy is

greater than $75,000, exclusive of interest and costs.

7    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and

(c) and §1400(b).

8    Jurisdiction and venue are also proper in this district because the Defendant

consented to this jurisdiction and venue pursuant to an agreement between

WEP and Henkel CA

## BACKGROUND

9.   United States Patent No. 5,697,302 ("the '302 patent") was duly and legally

issued to Putnam on December 16, 1997.  A copy of the '302 patent is

attached hereto as Exhibit A.  Putnam is the owner of all rights, title and

interest in the '302 patent, including the right to recover for any and all

infringement thereof.  WEP, which is owned and controlled by Putnam, is

the exclusive licensee of the '302 patent.  WEP has been selling products

manufactured and marked in accordance with one or more claims of the '302

patent since 1997.

10   By 2003, WEP had realized some sales of the patented products.

11   Putnam and Henkel CA met in 2003 to discuss the '302 patent, as well as

3

other ideas conceived by Putnam for improving existing and future products made in accordance with the '302 patent. At that time, Henkel CA was already offering several shelf lining products in direct competition with WEP products.

11      Henkel CA agreed to meet with Putnam to discuss the proposed license and business relationship. On May 7, 2003, Putnam traveled to Ohio to meet with several Henkel CA executives. Prior to the meeting, Henkel CA signed a Confidentiality and Nondisclosure Agreement ("Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit B.

12      Upon securing Henkel CA's promise of confidentiality, Putnam disclosed certain proprietary information to the defendant. Following the meeting, Henkel CA evaluated the information and proposed a working relationship with WEP   Ultimately, however, no business relationship or licensing arrangement was ever formed between Putnam and Henkel CA.

13      After the parties terminated negotiations relating to the above described business relationship, Putnam learned of certain products being advertised and sold by Henkel CA, which upon information and belief, infringe at least one claim in the '302 patent. Further, Putnam also became aware of Henkel CA products that make use of the proprietary information disclosed to

4

defendant, during the meeting May 7, 2003, in reliance on the Agreement.

14.     On August 13, 2003, Henkel CA's senior patent counsel was notified of Henkel CA's possible infringement of the '302 patent. The same letter also notified Henkel CA's counsel of Henkel CA's apparent violation of the Agreement and requested that Henkel CA refrain from further violation of the Agreement. A copy of the August 13, 2003 letter is attached hereto as Exhibit C.

15.     Since August 13, 2003, Henkel CA has sold products which, when used for their intended purpose, applying the instructions, directions, and information provided by Henkel CA with express knowledge of the '302 patent, infringe at least one claim in the '302 patent.

16.     Henkel CA continues to sell products embodying WEP proprietary information, in willful violation of the above-described Agreement.

## COUNT I--PATENT INFRINGEMENT

17.     Plaintiffs incorporate by reference the allegations of paragraphs 1-16 of this Complaint as if restated in full herein.

18      Plaintiffs have always marked products made in accordance with the '302 patent pursuant to 35 U.S.C. § 287.

19      Henkel CA infringes one or more claims of the '302 patent by actively

inducing others to purchase and use its products in ways that infringe at least one claim of the '302 patent.

20.  Plaintiffs have been damaged as a result of the infringing products of Henkel CA, and will continue to be damaged unless such activities are enjoined by this Court  Plaintiffs are entitled to an order of injunctive relief in addition to damages.

21   As a result of these acts of patent infringement, Plaintiffs are entitled to recover damages, including, but not limited, to a reasonable royalty

## COUNT II-WILLFUL PATENT INFRINGEMENT

22.  Plaintiffs incorporate by reference the allegations of paragraphs 1-21 of this Complaint as if restated in full herein.

23.  Henkel CA, by virtue of WEP's marking of its products, and by virtue of the letter from Putnam's counsel in 2003, had notice of the '302 patent and the substance of the claims therein

24.  Nevertheless, Henkel CA continued to advertise, sell and offer for sale products that actively induce users to infringe one or more claims of the '302 patent.

25   Thus Henkel CA's actions are willfully in derogation of Plaintiffs' rights

26   As such, any damages to Plaintiffs in this case should be trebled, and this

6

case should be deemed exceptional under 35 U S.C. § 285.

## COUNT III-BREACH OF CONTRACT

27    WEP incorporates the allegations of paragraphs 1-26 of this Complaint as if restated in full herein

28    Upon information and belief, Henkel CA has materially breached its Confidentiality and Nondisclosure Agreement with WEP by selling and continuing to sell confidential information disclosed to Henkel CA pursuant to that Agreement.

29.    As a result of this breach, WEP is entitled to recover damages in an amount not yet determined

30    WEP is also entitled to recover its attorney's fees and costs in this matter pursuant to O C G A § 13-6-11, because Henkel CA has acted in bad faith in disregarding its contractual obligations and Plaintiffs' rights, and Defendant has put Plaintiffs to unreasonable trouble and expense.

## PRAYER FOR RELIEF

WHEREFORE, WEP prays for trial by jury, judgment and relief after entry of final verdict, including:

1.    A judgment that Henkel CA has infringed at least one claim of the '302 patent,

2      An injunction against Henkel CA 's continued infringement of the

       '302 patent pursuant to 35 U S.C  § 283;

3.     An award of damages resulting from Henkel CA's acts of patent

       infringement;

4      An assessment of interest on the damages so computed;

5.     A trebling of such damages,

6.     A declaration that this case is exceptional pursuant to 35 U.S.C. § 285,

       and an award of WEP's attorney's fees  and costs incurred;

7      A judgment that Henkel CA has breached the terms of the

       Confidentiality and Nondisclosure Agreement with WEP Enterprises,

       Inc.;

8      An injunction against Henkel CA's continued violation of that

       Agreement,

9.     An award of damages, attorney's fees and costs incurred by WEP as a

       result of that breach; and

10     Such other and further relief as this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

WEP demands trial by jury on all claims and issues so triable.

This 1st day of August, 2005.

8

Respectfully submitted,

Steven G. Hill
Georgia Bar No 354658
Eric G Maurer
Georgia Bar No 478199
Matthew D Durell
Georgia Bar No. 142061

HILL, KERTSCHER & WHARTON LLP
3350 Riverwood Parkway
Suite 800
Atlanta, Georgia 30339
Telephone· (770) 953-0995
Facsimile: (770) 953-1358

*Attorneys for Plaintiffs Michael Putnam and WEP Enterprises, Inc.*

# FREED & BERMAN, P.C.

ATTORNEYS AT LAW

GARY S. FREED  (GA & NY)
JEFFREY N. BERMAN
BENJAMIN I. FINK  (GA & NJ)
CHARLES HALE VAN HORN
KENNETH A. HINDMAN  (GA & VA)

OF COUNSEL:
HENRY M. FEINSTEIN
ROBERT H. McKNIGHT, P.C.

ANDREA M. MULLER
BRENDA K. COLLURA
AARON B. CHAUSMER
WILLIAM J. PIERCY
MICHELLE M. KENYON
SUZANNE E. DEDDISH
STEVEN A. WAGNER

August 13, 2003

Writer's Direct E-mail
jberman@freedberman.com

Glenn Murphy, Senior Patent Attorney
Henkel Corporation
2500 Renaissance Boulevard
Suite 200
Gulph Mills, Pennsylvania 19406

*VIA FACSIMILE (610) 278-6548*
*and FIRST CLASS MAIL*

Re:   Michael Putnam and WEP Enterprises, Inc.
       Our File No. 0250-4

Dear Glenn:

It is my understanding, based upon a conversation that Michael Putnam had with Bill Kahl, that Henkel is not interested in further pursuing a business relationship with Mr. Putnam or WEP Enterprise, Inc. regarding WEP's "shelf COVER" product.

As you know, Mr. Putnam is the owner of U.S. Patent No. 5,697,302 (the "Patent") issued on December 16, 1997. As we discussed, we believe that the "Wire Shelving Easy Liner" which is being manufactured, distributed and sold by Henkel Consumer Adhesives, Inc. ("Henkel") is covered by claims in the Patent. At a minimum, Henkel is actively inducing consumers to infringe on the Patent, or is contributing to infringement of the Patent by selling the Easy Liner for use with wire frame shelving.

Accordingly, Henkel should either cease and desist in its production and sale of the Easy Liner, or contact us to further discuss and negotiate a license to WEP's patented product. In addition, please be aware that Henkel signed the enclosed Confidentiality and Non-Disclosure Agreement. Please admonish Henkel to be certain that it takes no action that may be in violation of this Agreement.

Finally, please have Henkel return to Mr. Putnam and WEP, in care of my office, all information and/or samples that Henkel received from Mr. Putnam and/or WEP relating to the "shelf COVER" product or any other product.

Glenn Murphy, Senior Patent Attorney
August 13, 2003
Page 2

We look forward to hearing from you shortly in regard to these issues.

Very truly yours,

FREED & BERMAN, P.C.

Jeffrey N. Berman

JNB:dcj
Enclosure
cc:    Mr. Michael Putnam
H:\00250-4\murphy ltr(v3) doc



US005697302A

# United States Patent [19]

## Putnam

[11] **Patent Number:** 5,697,302

[45] **Date of Patent:** Dec. 16, 1997

[54] **SHELF COVER**

[76] Inventor: **Michael A. Putnam**, 4961 Lower Roswell Rd., Marietta, Ga 30068

[21] Appl. No.: **834,083**

[22] Filed: **Apr. 14, 1997**

### Related U.S. Application Data

[63] Continuation of Ser. No 643,552, May 6, 1996, abandoned.

[51] Int. Cl.⁶ .................................. A47B 13/08
[52] U.S. Cl. ................... **108/90**; 150/158
[58] Field of Search .................. 108/90, 51.1, 55 1, 108/55 3, 901; 150/158, 154

[56] **References Cited**

#### U.S PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| Re. 29,192 | 4/1977 | Anderson et al | .... ........ 108/55 3 X |
| 1,979,578 | 11/1934 | Simmons | |
| 2,714,559 | 8/1955 | Sheffield et al. | |
| 3,452,497 | 7/1969 | Warp | |
| 3,738,405 | 6/1973 | Ericson | ..................... .... .. 108/90 X |
| 4,196,244 | 4/1980 | Roman | |
| 4,603,074 | 7/1986 | Pate et al | |
| 4,616,434 | 10/1986 | Riba et al | .. .... . ........ ... . 108/90 X |
| 4,708,183 | 11/1987 | Figueroa | .. ............ ... ....... ...... 108/90 |
| 4,716,840 | 1/1988 | Tungah et al | ........ . ............. 108/90 X |
| 4,750,402 | 6/1988 | Markey | .... ............... ............ 108/90 X |
| 4,844,972 | 7/1989 | Tedeschi et al | |
| 4,917,932 | 4/1990 | McClung | |
| 5,284,099 | 2/1994 | Cohen | .. .. ........ .... ....... .... 108/90 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 642491 | 4/1964 | Belgium | .... ..... . ... ............. 108/90 |
| 1414638 | 11/1975 | United Kingdom | ............ . .. 108/51 1 |

*Primary Examiner*—Jose V Chen
*Attorney, Agent, or Firm*—Dean W. Russell; Michael F. Labbee, Kilpatrick Stockton LLP

[57] **ABSTRACT**

A relatively thick shelf covering for use with wire-frame shelves. The material is sufficiently thick to prevent objects from falling through or tilting into the spaces between the gratings of a wire-frame shelf. The material is also flexible enough to be sold in rolls. The material is also impervious to water and most common household chemicals.

**3 Claims, 1 Drawing Sheet**







FIG 1

FIG 2

FIG 3

FIG 4

FIG 5

FIG 6

FIG 7

FIG 8

FIG 9

5,697,302

# 1

## SHELF COVER

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 08/643,552, filed May 6, 1996, by Michael A. Putnam, entitled "SHELF COVER", now abandoned.

1. Field of the Invention

This invention relates to shelf coverings for use with wire-frame shelves.

2. Background of the Invention

Shelving used in storage compartments, bookcases, cupboards and medicine cabinets may be made from a variety of materials such as wood, glass, plastic, etc. One popular approach is to use a wire-frame construction. As can be seen in FIG. 1, a wire-frame shelf generally uses two or more longitudinal members 2 with a number of closely spaced cross-members 3. This structure is aesthetically pleasing, and both lightweight and inexpensive because substantially less material than traditionally used can create the same amount of shelf space. A limitation of these shelves, however, is that any articles smaller than the distance 4 between any two cross-members 3 will fall through the shelf. Similarly, any object not substantially larger than the distance 4 between any two cross-members 3 will tend to tilt to one side or another. These limitations tend to frustrate the purpose of shelving—i.e., to permit the user efficiently and neatly to store items in a given storage area. Thus it would be desirable to provide a means for keeping store items neatly stored on wire-frame shelves while preserving the advantages of such shelving.

A solid shelf covering can be employed. However the use of plastic, glass or other heavy solids to cover the wire-frame shelf would defeat many of the advantages of wire-frame shelving, such as low cost and low weight. A solid shelf covering would also have a tendency to slide off of the shelf. An adhesive coating of some form might be used to prevent slippage, however this would increase the manufacturing cost of such a covering.

A cardboard covering can be used to reduce cost and weight. Without some form of coating, however, the cardboard would be susceptible to puncture or water damage—threats common to usage in the home. This can be resolved with coatings, such as that disclosed in U.S. Pat. No. 1,979,578 to Simmons, to render the material impervious. However, the application of such coatings tends to increase the manufacturing complexity and hence the cost of the device. Furthermore, both solid coverings and cardboard coverings would be bulky and therefore difficult to market.

Conventional flexible shelf coverings made from paper, plastic, vinyl and other flexible materials are available. Because these materials are flexible, they can be conveniently marketed in rolls. Nonetheless, these coverings are designed for solid shelves; thus, they do not provide adequate support on a wire-frame shelf. In addition, these coverings are thin and can be easily damaged, requiring frequent replacement. Also, because they are very lightweight, conventional coverings are easily displaced from their intended position, and thus require some form of adhesive layer to bond them to the surface to which they are applied.

Many wire-frame shelves have a frontal grate portion 30 as in FIG. 6. For aesthetic reasons, it would be desirable for a shelf covering also to cover this portion. A solid coveting could be hinged in some fashion to provide this function,

# 2

however such a structure would inevitably increase the cost and complexity of the device. Conventional flexible coverings would need to be folded and, due to their light weight, would tend to be easily displaced, creating an unsightly and unkempt appearance, thus requiring an adhesive layer.

## SUMMARY OF THE INVENTION

The present invention provides a shelf cover for wire-frame shelves with the benefits of both rigid and flexible shelf covers. The shelf cover of the present invention is constructed from a relatively thick but flexible material. The material is sufficiently thick to avoid deformation when placed on a wire-frame shelf and sufficiently flexible to be rolled up for storage or sale. The material may also have a lateral notch along the underside of the cover so that a portion of the cover may be folded down to cover the frontal grating of the shelf. Because the material is inherently heavy, it tends to hang down under the force of gravity and is not prone to flying up and exposing the underlying grating.

In order to prevent the material from sliding off the shelf, the material is sufficiently soft so that the wire cross members tend to make a slight impression or indentation in the material. This indentation helps seat the material on the cross members, preventing the material from sliding off the shelf. One side of the material may be textured or coated with an adhesive to further prevent slippage. Also, one side of the material may be treated so that it tends to adhere gently to the vinyl coating that is generally found on wire-frame shelves. The cover may also have two layers, where the bottom layer uses a material that adheres to the vinyl coating. In addition, the material is impervious to water and other chemicals or solvents normally found in the home, allowing it to be easily cleaned. The material is also very durable, requiring infrequent replacement.

It is therefore an object of the present invention to provide a shelf covering for use with wire-frame shelves that is flexible yet rigid enough to avoid deformation between the cross members of the shelf.

It is also an object of the present invention to provide a shelf covering that will not easily slide off the shelf.

It is a further object of the invention to provide a shelf covering that is impervious to water, easily cleaned and durable.

Yet another object of the invention is to provide a shelf covering that is capable of covering the frontal grating portion of a wire-frame shelf.

Other objects, features and advantages of the present invention will become apparent with reference to the remainder of the written portion and the drawing of this application.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of a conventional wire-frame shelf.

FIG. 2 is a perspective view of the shelf of FIG. 1 with a cover consistent with the present invention partially installed thereon.

FIG. 3 is a cross-sectional view of a portion of the shelf of FIG. 1 with a cover consistent with the invention installed thereon.

FIG. 4 is a cross-sectional view of a portion of the shelf of FIG. 1 with a cover consistent with a second embodiment of the invention installed thereon.

FIG. 5 is a perspective view of the cover showing the corrugations of a first embodiment.

5,697,302

3

FIG. 6 is a perspective view of a wire frame shelf with a frontal grate.

FIG. 7 is a cross-sectional view of a cover of the invention adapted to be used with the grate of FIG. 6.

FIG. 8 is a cross-sectional view of a cover consistent with a third embodiment of the invention.

FIG. 9 is a partial elevation of an extrusion mold for extruding the cover of FIG. 7.

DETAILED DESCRIPTION OF THE DRAWINGS

FIG 1 shows a conventional wire-frame shelf 1. The shelf 1 is composed of at least two parallel longitudinal members 2 spanned by numerous cross members 3. The cross members 3 are separated by a distance 4 which may vary depending on the size and intended use of the shelf. For instance, smaller shelves used in medicine cabinets may have a distance 4 of less than one half of an inch. Larger shelves used for storage closets may have a distance 4 of three quarters of an inch or more. The wire-frame shelf has risen in popularity for a number of reasons, including aesthetic appearance, low weight and low cost. Nonetheless, the wire-frame shelf does present a significant drawback. Any items that are not substantially larger than the distance 4 will tend to topple or even fall through the shelf This frustrates the intended purpose of the shelf, which is to allow the orderly storage of various items.

FIG. 2 illustrates a shelf cover 10 that effectively eliminates the problem created by the wire-flame shelf 1 A flexible and relatively thick material is used to make a shelf cover 10. The material may be vinyl, plastic, rubber or paper, and it has been found that polyvinyl chloride (PVC) provides a variety of beneficial qualities. First, PVC is very flexible. This allows the cover 10 to be rolled up for marketing and sale. PVC is easily cut, allowing the cover 10 to be trimmed to fit. PVC is impervious to water and most household chemicals, making it durable and easy to clean. PVC also can easily be made in different thicknesses.

The ability to vary the thickness is important, because, as seen in FIG. 3, the thickness 11 of the cover 10 ensures that the cover 10 can support objects in between the cross-members 3. Given a constant rigidity of the cover 10 for a given thickness 11, the deformation of the cover 10 into the space defined by distance 4 is proportional to the magnitude of the distance 4. Thus, as distance 4 increases, a cover 10 of a given thickness will tend to "droop" into the space. The amount of droop for any thickness 11 and distance 4 is determined by the inherent rigidity of the material from which the cover 10 is made. Thus, for a shelf with cross members 3 spaced at a distance 4 of one half inch, a cover 10 made of PVC with a thickness of one eighth inch might have no perceptible droop. A cover 10 made of PVC with a thickness of one thirty-second inch might have a perceptible droop. It has been determined that a cover 10 made of PVC with a thickness of approximately one-sixteenth inch has no perceptible droop for distances 4 of up to one and one-half inch and is thus functional for the conventional range of distances 4 used in wire-frame shelves. If other materials other than PVC are used, experimentation will determine the appropriate thickness 11 to avoid perceptible droop.

Another advantage of using PVC is that it is slightly compressible. As can be seen in FIG. 3, when the cover 10 is placed on the shelf 1, the portions of the cover 10 resting on the cross members 3 deform slightly to create indentations 16. These indentations 16 help the cover 10 "grip" the cross members 3 to prevent the cover 10 from sliding off the shelf 1. Other means for ensuring a non-slip installation can

4

also be used. For example, as illustrated in FIG 4, a layer of heat-activated adhesive 18 may be applied to the bottom face 14 of the cover 10. The cover 10 is applied to the shelf 1 and heat is applied to affix the cover 10 to the shelf 1 Another alternative, as shown in FIG. 5, is to provide corrugations 20 on the bottom face 14 of the cover 10. These corrugations 20 roughen the bottom face 14 and increase the friction between the cover 10 and the shelf 1, thereby reducing slippage.

Another approach (not illustrated) that may be used to ensure a proper grip is to treat the bottom face 14 of the material to soften it somewhat. The softening will have the effect of making the material slightly adherent to the vinyl covering that is generally used on wire-frame shelves. A variation of this approach is seen in FIG 8, where a bi-layer approach is used. A top layer 34 is made of the flexible and relatively thick material, while a bottom layer 36 is made of a softer material that is naturally adherent to the vinyl covering on the wire shelf. The layers 34 and 36 may be bonded with glues, heat melding or other conventional means. This approach provides the advantage of allowing selection of particular material matched each function, rather than selecting one material that meets the principal function and yet can be treated so as to provide the desired adherence.

Some typical wire-frame shelves, as in FIG. 6, will include a frontal grating 30 for aesthetic purposes. For the same reason, it would be desirable for the cover 10 to drape over the frontal grating 30. As seen in FIG. 7, a small notch 32 can be made in the bottom surface 14 of the cover 10. This notch 32 allows the cover 10 to be folded down over the frontal grating 30. The notch 32 can be applied to any of the embodiments, including the bi-layer embodiment seen in FIG. 8, the corrugated embodiment seen in FIG. 5 and the adhesive embodiment as seen in FIG. 4. The notch 32 can be formed during the manufacturing process For example, if the material is extruded, as in FIG. 9, the notch 32 can be incorporated into the extrusion mold 50 by providing a notch forming means 52 Also, once the material is formed, it may be drawn over a knife blade (not illustrated) that cuts the desired notch 32 in the bottom face 14.

Although the foregoing is provided for purposes of illustrating, explaining and describing embodiments of the present invention, modifications and adaptations to these embodiments will be apparent to those skilled in the art and may be made without departing from the scope or spirit of the invention

I claim:

1. A removable, reusable covering for a wire-frame shelf having a frontal grating and cross-members defining gaps therebetween, which covering has a length, is in the form of a roll prior to use, and includes:

   a. an upper surface impervious to water,

   b  a lower surface having:
      i. means, comprising a notch spanning the length, for following the contour of the frontal grating when in use; and
      ii. non-adhesive means, comprising corrugations, for preventing movement of the lower surface relative to the shelf when in use; and

   c. a thickness of at least approximately one-sixteenth inch and sufficient to support objects placed on the upper surface over gaps between cross-members; and

which covering is made from extrudable material selected from the group consisting of vinyls, plastics, and rubbers.

2. A system for supporting objects comprising

5,697,302

<table>
<tr><td>5</td><td>6</td></tr>
</table>

a. a wire-frame shelf having a top surface comprising a plurality of approximately uniformly spaced cross-members; and

b. a sheet of material having:

  i a top face impervious to water;

  ii. a bottom face lacking adhesive, the bottom face being positioned on the top surface of the wire-frame shelf, in contact with the cross-members, so as to be removable therefrom for subsequent reuse;

  iii sufficient compressibility such that when the bottom face is positioned on the top surface of the wire-frame shelf, the cross-members create indentations on the bottom face, and

  iv a thickness proportional to the spacing between adjacent cross-members such that the material does not droop substantially in spaces between the cross-members

3 A removable, reusable covering for a wire-frame shelf having a frontal grating, which covering has a length and includes:

a. an upper surface impervious to water,

b. a lower surface having:

  i. means, comprising a notch spanning the length, for following the contour of the frontal grating when in use; and

  ii. means, comprising corrugations, for preventing movement of the lower surface relative to the shelf when in use, and

c. a thickness sufficient to support objects placed on the upper surface; and

which covering is made from extrudable material

* * * * *

## CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

This Agreement is made this 17 day of April, 2003, by and between WEP ENTERPRISES, INC., a Georgia corporation (the "Disclosing Party") and HENKEL CONSUMER ADHESIVE, INC., a _____ corporation with a business address of 32150 Just Imagine Drive _____ (the "Receiving Party").

Whereas, the parties to this Agreement intend to discuss a possible business arrangement; and

Whereas, as part of such discussions, the Disclosing Party may disclose to the Receiving Party certain information that is confidential and proprietary to the Disclosing Party; and

Whereas, the Disclosing Party will only disclose such information as long as the Receiving Party agrees to be bound by the terms of this Agreement; and

Whereas, as an inducement to the Disclosing Party to make disclosures of such information, the Receiving Party agrees to be bound by the terms hereof.

Therefore, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Confidential Information.**

(a) The parties recognize that in the course of their relationship, the Disclosing Party may disclose to the Receiving Party and the Receiving Party will have and continue to have access to certain Confidential Information (as defined below) belonging to the Disclosing Party and both parties desire that any such Confidential Information remain confidential. The Receiving Party agrees not to disclose the Confidential Information to any person or entity and to use the same means it uses to protect its own Confidential Information, but in no event less than reasonable means, to prevent the disclosure and to protect the confidentiality of the Confidential Information. The foregoing will not prevent the disclosure of Confidential Information that is (i) already known by the Receiving Party without an obligation of confidentiality, (ii) publicly known or becomes publicly known through no unauthorized act of the Receiving Party, (iii) rightfully received from a third party who received the Confidential Information without similar restrictions, (iv) independently developed by the Receiving Party without use of the Confidential Information, (v) approved by the Disclosing Party for disclosure, or (vi) required to be disclosed pursuant to a requirement of a governmental agency or law or court order so long as the Receiving Party provides the Disclosing Party with reasonable notice of such requirement prior to any such disclosure.

(b) Confidential Information means (i) information related to the Disclosing Party (A) which is deemed confidential and proprietary by the Disclosing Party and is not generally known to persons outside the Disclosing Party; and (B) which is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and (C) which is clearly marked as "confidential" or, if disclosed verbally, is confirmed in writing by Disclosing Party to be confidential in nature within 15 days of disclosure; and (ii) all tangible reproductions or embodiments of such information.

(c) Confidential Information includes, but is not limited to, the processes, formulas, machines, technical documentation, computer programs, business plans, executive summaries, marketing plans and techniques, pricing data, marketing programs, technical expertise and know how, all business records, trade secrets, customer names and lists or compilations, potential customers and potential customer lists, supplier contacts, lists or compilations, service partners, financial information, personnel data, existing or future products or services, employees and employment records of the Disclosing Party, independent contractors and independent contractor records of the Disclosing Party, and any information contained in any documents prepared by or for the Disclosing Party, at the Disclosing Party's expense or otherwise in furtherance of the Disclosing Party's business. Confidential Information also includes information which has been disclosed to the Disclosing Party by a third party and which the Disclosing Party is obligated to treat as confidential.

(d) The Receiving Party shall hold the Confidential Information in trust and strictest confidence,



and will not use, reproduce, distribute, disclose or otherwise disseminate the Confidential Information except as provided herein.

(a) The Receiving Party may disclose the Confidential Information to its employees and consultants, in each case on a "need to know" basis; provided that each such employee or consultant is first identified to the Disclosing Party. The Receiving Party guarantees to the Disclosing Party that the Receiving Party will pay for any loss, damage, or expense, including costs and reasonable attorneys' fees and expert fees, that the Disclosing Party incurs as a result of the breach of this Agreement by the Receiving Party or by any of the Receiving Party's employees or consultants to whom disclosure of Confidential Information is made hereunder.

2. **No Rights Granted.** Nothing contained in this Agreement shall be construed as granting or conferring any rights by license or otherwise to the Receiving Party in any Confidential Information disclosed to the Receiving Party. All Confidential Information shall remain the property of the Disclosing Party and shall be returned immediately upon request. All notes, abstracts, memoranda, or other documents and all electronically stored information prepared by the Receiving Party which contain Confidential Information or any discussion thereof, shall be destroyed or returned to the Disclosing Party upon written request. The Receiving Party will certify to the Disclosing Party that its has complied fully with the Disclosing Party's instructions and has not retained all or any portion of the Confidential Information. No disclosure of any Confidential Information hereunder shall be construed as a public disclosure of such Confidential Information by either party for any purpose whatsoever.

3. **Limitation of Obligations.** The furnishing of Confidential Information hereunder shall not obligate either party to enter into any further agreement or negotiation with the other or to refrain from entering into an agreement or negotiation with any other party.

4. **Remedies.** The parties agree that the provisions of this Agreement are of the essence of this Agreement and if the Receiving Party had not agreed to be bound thereby, the Disclosing Party would not make the disclosure contemplated hereby; that each of the covenants is reasonable and necessary to protect the business, interests and properties of the Disclosing Party; that the Disclosing Party would suffer irreparable damage in the event of any breach of this Agreement by the Receiving Party. Accordingly, the parties covenant and agree that the Disclosing Party will be entitled to temporary, preliminary and final injunctive relief, as well as any other applicable remedies at law or in equity against the Receiving Party if the Receiving Party had breached or threatens to breach this Agreement. In the event the Disclosing Party retains an attorney to enforce the terms of this Agreement, the Disclosing Party will be entitled to recover from the Receiving Party all of its costs and attorneys' fees. The existence of any claim of the Receiving Party against the Disclosing Party shall not constitute a defense to the enforcement by the Disclosing Party of the covenants and agreements contained in this Agreement.

5. **Miscellaneous.**

(a) It is the intention of the parties that the laws of the State of Georgia should govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties.

(b) It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible. Accordingly, if any particular paragraph(s), subparagraph(s) or portion(s) of this Agreement shall be adjudicated to be invalid or unenforceable as written, such paragraph(s) subparagraph(s) or portion(s) shall be modified to the extent necessary to be valid or enforceable. Such modification shall not affect the remaining provisions of this Agreement. To the extent any paragraph(s), subparagraph(s) or portion(s) of this Agreement found invalid or unenforceable cannot be modified to be made valid or enforceable, then the Agreement shall be construed as if that paragraph(s), subparagraph(s) or portion(s) were deleted, and all remaining terms and provisions shall be enforceable in law or equity in accordance with their terms.

(c) A waiver by either party of any breach of this Agreement by the other party shall not operate or be construed as a waiver of the same or another breach on a subsequent occasion.

(d) The parties agree that the Superior Court of Fulton County, Georgia or the Federal District Court for the Northern District of Georgia, Atlanta Division shall be the sole and exclusive jurisdiction and venue for all disputes between the parties. Each party hereby consents to the jurisdiction and venue of the Superior Court

of Fulton County, Georgia and the Federal District Court for the Northern District of Georgia, Atlanta Division for adjudication of all disputes between the parties. Receiving Party hereby waives any objections or defenses to jurisdiction or venue in any proceeding before such Courts.

(e) The restrictions and obligations of this Agreement shall survive any expiration, termination or cancellation of this Agreement and shall continue to bind the parties, their affiliates, employees, successors, heirs and assigns.

(f) This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument. Facsimile signatures will be recognized as original signatures.

(g) The parties to this Agreement agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the parties' negotiations. Each party warrants and represents that it has sought and received legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a party or parties on the grounds that the party or parties drafted or was more responsible for drafting the provision(s).

(h) Each individual signing below warrants and represents that he has the authority to execute this Agreement and bind the party on whose behalf he is signing.

IN WITNESS WHEREOF, each party hereto has caused this Agreement to be executed by its duly authorized officer under seal as of the date first written above.

WEP Enterprises, Inc.

By: _____

Michael Pittman, President

Attest: _____
                    Secretary


HENKEL CONSUMER ADHESIVE, INC.

By: _____
Gary Medalis, General Manager and VP

Attest: _____
ATV Secretary


Reviewed By Stan Locaitoni 4/17/03